```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA


  UNITED STATES OF AMERICA,        .
                                   .
              Plaintiff,           .   CR No. 24-0135 (TSC)
                                   .
        v.                         .
                                   .
  JOHN BANUELOS,                   .   Washington, D.C.
                                   .   Wednesday, August 21, 2024
              Defendant.           .   11:33 a.m.
  . . . . . . . . . . . . . . .    .
```

                    TRANSCRIPT OF STATUS HEARING
              BEFORE THE HONORABLE TANYA S. CHUTKAN
                   UNITED STATES DISTRICT JUDGE



     <u>APPEARANCES</u>:

 For the Government:            REBEKAH LEDERRER, AUSA
                                U.S. Attorney's Office
                                601 D Street NW
                                Washington, DC 20530


 For Defendant:                 MICHAEL E. LAWLOR, ESQ.
                                Brennan, McKenna & Lawlor
                                6305 Ivy Lane
                                Suite 700
                                Greenbelt, MD 20770

 Court Reporter:                BRYAN A. WAYNE, RPR, CRR
                                U.S. Courthouse, Room 4704-A
                                333 Constitution Avenue NW
                                Washington, DC 20001




Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

THE DEPUTY CLERK:  Good morning, everyone.  We're here today for an arraignment and motion hearing in criminal action 24-135, the United States of America versus John Banuelos. Beginning with counsel for the government, please approach the lectern and identify yourself for the record.

MS. LEDERER:  Good morning, Your Honor. Rebekah Lederer on behalf of the United States.

THE COURT:  Good morning, Ms. Lederer.

MR. LAWLOR:  Good morning, Your Honor.  Michael Lawlor for Mr. Banuelos.

THE COURT:  Good morning, Mr. Lawlor.  Good morning, Mr. Banuelos.  How are you doing?

THE DEFENDANT:  Good morning.  (Inaudible.)

THE COURT:  Thank you.  We are here today for a status conference and also a hearing on a motion to appeal the detention hearing that Mr. Lawlor filed, and I've received the government's response.  But while we're here, we also have to have -- the government has issued a superseding indictment against Mr. Banuelos, so let's do the arraignment first.

Mr. Banuelos, when I first met you, it was by Zoom -- do you remember that hearing? -- and I arraigned you, and I explained to you at the time that the arraignment is simply the formal presentation of the charges against you.  The government has now filed what we call a superseding

1    indictment.  That is a new one, and it replaces the old one.

2    And because they filed a superseding indictment, you have to

3    be arraigned again on the new indictment.

4        And can you -- this superseding indictment charges

5    Mr. Banuelos with nine counts of criminal conduct arising from

6    the riots on January 6.  Did you all add some counts or just

7    change the language?  What's the difference, Ms. Lederer?

8        MS. LEDERER:  Yes, Your Honor.  The government added

9    three counts, which should be Counts 7, 8, and 9 under the

10    D.C. Code, the firearms charges.

11        THE COURT:  Oh, that's right.  Okay.

12    Ms. Bell-Norwood, will you arraign Mr. Banuelos, please.

13        THE DEPUTY CLERK:  Your Honor, let the record reflect

14    that the defense counsel and his client have been provided a

15    copy of the superseding indictment.

16        Sir, you are Mr. John Banuelos?

17        THE DEFENDANT:  Johnny Manuel Banuelos.  That's my

18    full name.

19        THE DEPUTY CLERK:  I'm sorry.  Say that again, sir?

20        THE DEFENDANT:  Johnny Manuel Banuelos.

21        THE DEPUTY CLERK:  All right.  Sir, you are hereby

22    charged in the nine-count superseding indictment:

23        Count 1.  Civil Disorder, in violation of Title 18 United

24    States Code § 231(a)(3).

25        Count 2.  Entering and Remaining in a Restricted Building

or Grounds with a Deadly or Dangerous Weapon or Firearm, in violation of Title 18 United States Code § 1752(a)(1) and (b)(1)(A).

Count 3.  Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon or Firearm, in violation of Title 18 United States Code § 1752(a)(2)(b)(1)(A).

Count 4.  Unlawful Possession of a Firearm on Capitol Grounds or Buildings, in violation of Title 40 United States Code § 5104(e)(1)(A)(i).

Count 5.  Unlawful Discharge of a Firearm on Capitol Grounds or Buildings, in violation of Title 40 United States Code § 5104(e)(1)(A)(ii).

Count 6.  Disorderly Conduct in a Capitol Building, in violation of Title 40 United States Code § 5104(e)(2)(D).

Count 7.  Unlawful Discharge of a Firearm, in violation of 22 D.C. Code § 4503.01.

Count 8.  Carrying a Pistol Without a License (Outside Home or Place of Business), in Violation of License to Carry a Pistol Emergency Amendment Act of 2014 and the License to Carry a Pistol Clarification Emergency Amendment Act of 2014, to be codified as 22 D.C. Code § 4504(a), 2001 edition.

Count 9.  Possession of Unregistered Firearm, in violation of 7 D.C. Code § 2502.01(a), 2001 edition.

For the purposes of today's hearing, how do you wish to

1    plead, and do you waive the formal reading of the charges?

2        MR. LAWLOR:  We will waive a formal reading of the

3    indictment, enter a plea of not guilty to all nine charges,

4    and request a speedy trial by jury.

5        THE COURT:  All right.  Thank you, Mr. Lawlor.

6      Now, I forgot also, we do have a representative from

7    Pretrial Services here.  Sorry about that; the monitor blocks

8    you.  Do you want to state your name for the record?

9        PRETRIAL OFFICER:  Good morning, Your Honor.

10   Lakeisha Forbes on behalf of Pretrial Services Agency.

11       THE COURT:  Thank you.  All right.  Now, we're doing

12   three things today, so we've already done one.  One was the

13   arraignment.  We're going to have a status conference, and

14   then I'm going to hear the motion to modify your conditions

15   of release or to set conditions of release, to appeal the

16   detention hearing.

17     So at our last status conference, the government

18   represented that it had turned over most of the discovery to

19   Mr. Lawlor, but it was still waiting on the firearms report

20   and material from Mr. Banuelos's cell phone, Twitter account,

21   and video footage from his mother's home, as well as statements

22   made during an unrelated investigation.  It looks like, based

23   on the response to the detention motion, you've gotten that.

24   What's the status?

25       MS. LEDERER:  Your Honor, as for the firearms report,

1    based off of the superseding indictment and the detention

2    response, that report has been received and the material has

3    been provided to defense.  Defense had also been previously

4    provided a transcript of a prior statement to law enforcement.

5    I have received a video copy of the actual interview, but

6    defense has the transcript.  I'm still trying to figure out

7    a way to put that on something to hand that over to defense

8    counsel.

9        Also, at the last listing, the government did have in its

10   possession the pole cam footage from Mr. Banuelos's residence

11   in Illinois.  I had stated that we were also trying to work

12   together, because I had received that on a massive hard drive,

13   of a digestible way to get that to defense.

14       THE COURT:  What about the actual videotape of the --

15   oh, you said you were seeking a way to get that to him?

16       MS. LEDERER:  Yes.  But he has the written-out

17   transcript of that interview, which was from an unrelated

18   investigation during which Mr. Banuelos did mention January 6,

19   however.

20       THE COURT:  All right.  And is that the bar fight,

21   the stabbing, whatever, that was ruled self-defense?

22       MS. LEDERER:  It was a park fight, but yes.

23       THE COURT:  Okay.  That's right.  All right.

24   What about the cell phone downloads to Cellebrite --

25       MS. LEDERER:  I have received the cell phone download

1    and the Twitter search warrant download.  I'm also attempting

2    to figure out a way to put that onto something digestible to

3    hand that over to defense.  Nothing that was used in the

4    detention memo was from -- I mean, it might be located in the

5    search warrant, but that was all sourced openly from a public

6    account.

7        THE COURT:  Okay.  All right.  Thank you.  Oh, so other

8    than the items you've just discussed, the rest of discovery's

9    been turned over.  Is that right?

10       MS. LEDERER:  Yes, Your Honor.

11       THE COURT:  Has a plea offer been extended to

12   Mr. Banuelos?

13       MS. LEDERER:  No, Your Honor.  Based off of the fact

14   that we had to still supersede and wait for the firearms

15   report to come back, a plea offer has not been made yet.

16       THE COURT:  Do you anticipate one will be made?

17       MS. LEDERER:  Yes, Your Honor.

18       THE COURT:  Okay.  All right.  Anything you want --

19   do you want to be heard on the discovery issue, Mr. Lawlor?

20       MR. LAWLOR:  No, Your Honor.  Everything the government

21   represented is our understanding of where things stand as well.

22       THE COURT:  Okay.  All right.  Now, on to the third

23   issue, which is the issue of Mr. Banuelos's pretrial

24   detention.  On August 14 he filed a motion challenging his

25   detention pending trial.  I ordered the government to respond

1    sooner than local rules require, actually, so that I could

2    hear this at today's status.  Mr. Banuelos made his initial

3    appearance in the Northern District of Illinois on March 8

4    before Magistrate Judge Jantz.

5        The government announced its intention then to seek

6    detention pending trial.  A week later, Judge Jantz held a

7    detention hearing and ordered Mr. Banuelos detained pending

8    trial, concluding that the government proved by clear and

9    convincing evidence that no condition or combination of

10   conditions of release would reasonably assure the safety

11   of any other person and the community.

12       Judge Jantz found that the weight of the evidence against

13   Mr. Banuelos to be so strong and that he was subject to a

14   lengthy period of incarceration if convicted.  He had a prior

15   criminal history, a history of violence or use of weapons,

16   lacked a stable residence, and had previously failed to appear

17   in court as ordered.

18       Having found those things, he -- in addition that

19   Mr. Banuelos had previously attempted to evade law enforcement

20   and had prior violations of probation, parole, or supervised

21   release.  That order of detention is set forth in 24-CR-125 in

22   the Northern District of Illinois.

23       This court reviews detention decisions *de novo*.  That means

24   anew.  That's just a Latin way of saying I look at it again,

25   and I have.

1    In our society, liberty is the norm, and detention prior to

2    trial is the carefully limited exception.  And those are the

3    words of the Supreme Court.  Pretrial detention is proper

4    only where, after a hearing, the judicial officer finds that

5    no condition or combination of conditions will reasonably

6    assure the appearance of the person as required and the safety

7    of any other person and the community.  I'm quoting there from

8    18 U.S.C. § 3142(e)(1).

9    The court has to find by a preponderance of the evidence

10   the need to detain a defendant based on risk of flight, and

11   clear and convincing evidence is necessary to justify

12   detention based on dangerousness.

13   So in this analysis, I have to consider both the nature

14   and circumstances of the offense charged, the weight of the

15   evidence, the history and characteristics of the defendant,

16   and the nature and seriousness of the danger to any person or

17   the community.

18   With respect to the nature and circumstances of the

19   offense, Mr. Banuelos argues that he does not pose a danger

20   to the community because he did not engage in any acts of

21   violence on January 6, including that he did not assault law

22   enforcement or point a firearm at anyone.  He also argues

23   that he did not enter the Capitol building or plot to disrupt

24   Congress.

25   Those facts may be true, but that argument omits a very

1   glaring fact or allegation, which is that Mr. Banuelos is

2   charged with not only taking a firearm to the riots, but

3   discharging that firearm in the midst of the riots in the air.

4       And while -- obviously, whether he did that or not will

5   be determined by a jury, and they would have to find that he

6   did so beyond a reasonable doubt -- the evidence of that is

7   beyond clear and convincing in that the government has

8   provided photographic evidence not just of the gun in

9   Mr. Banuelos's waist, but then also photographic evidence

10  of Mr. Banuelos firing that gun above his head while on

11  scaffolding outside the Capitol.

12      So it's true he didn't point the gun at any law enforcement

13  officers, because you'd be in a whole different situation --

14  hold on, Mr. Banuelos -- and you didn't enter the Capitol.

15  All that is true.  But discharging a firearm in those

16  circumstances is clear and convincing evidence, as far as this

17  court is concerned, of dangerousness.

18      Here's the thing:  We talked about this before.  Mr. Lawlor

19  is a very good lawyer.  He's there to protect your interests

20  and rights, and anything you say in open court can be used

21  against you.  There's a court reporter taking it down.  So why

22  don't you talk to Mr. Lawlor first before you start talking.

23  Okay?  I've turned the husher on.  Talk to Mr. Lawlor.

24      (Defense conferring.)

25          MR. LAWLOR:  Thank you, Your Honor.

1              THE COURT:  All right.  That's why he's there,

2     Mr. Banuelos, so you don't get yourself into difficulty.

3     You understand?

4              THE DEFENDANT:  Yes.

5              THE COURT:  Like I said, you wouldn't do your own

6     surgery.  Same thing.

7              THE DEFENDANT:  I saw you on TV.  You looked very

8     lovely in your pink suit.

9              THE COURT:  Oh, no.

10             THE DEFENDANT:  Yeah.

11             THE COURT:  Well, thank you, but I don't remember a

12    pink -- well, that's an old picture.

13             MR. LAWLOR:  He asked me if he should say that, and for

14    the record, I said no.

15             THE COURT:  That's all right.  I appreciate it.  It

16    is an old photograph, if that's the one I'm thinking about.

17        So, yeah.  You have to be careful.  I know there are things

18    you want to express, but really talk to Mr. Lawlor before you

19    say anything.

20        All right.  But there's more I have to consider, and one

21    of the things I have to talk about is your history and

22    characteristics.

23        Now, Mr. Banuelos argues that he has a supportive family,

24    no prior convictions for felony offenses, and his prior

25    convictions are not recent.  And he argues that he is not a

flight risk because he has known for years that he was being
investigated for his conduct on January 6, and he believes that
any concerns that the court may have about flight risk can be
addressed through home detention or electronic monitoring.

The government responds, of course, that the prior issues
with failure to appear outweigh that, and it doesn't appear
that Mr. Banuelos has a place that -- a stable enough
residence for him to be placed on home detention; but
moreover, that would be in Illinois, where he would have to
be subject to monitoring by Pretrial Services there.

Anything else that I need to hear that wasn't in your
pleadings, Ms. Lederer?

MS. LEDERER:  No, Your Honor.  We laid out in great
detail the different contacts and states that Mr. Banuelos has
connections to.

THE COURT:  Okay.  Mr. Lawlor?

MR. LAWLOR:  So, Your Honor, I do believe that, amongst
other things, that Mr. Banuelos does have a stable residence
to reside in.  His mother and sister live in the suburbs of
Chicago.  That's where he was residing at the time of his
arrest.  He had been there for some period of time.  That's
where his children are now.  They're with his mother.  So he
can go to a stable place of residence.  His children are there
and need him to be there, and I do believe -- I understand the
court's concerns.  But if Mr. Banuelos was on 24-hour home

1    electronic monitoring with a GPS device, I believe that would

2    solve any concerns about risk of flight or risk of danger to

3    the community.

4        I do understand the seriousness of the allegation here.

5    I think, you know, Mr. Banuelos -- this'll be addressed in

6    more detail at a later time, but I think that the government's

7    allegation against Mr. Banuelos regarding the firearm, he

8    didn't mean to do any harm.  It was a very, very poor choice,

9    but he did not mean to do anyone any harm that day.

10            THE COURT:  I take that -- I take you at your word

11    because, I mean, obviously, with a loaded weapon, we could

12    have been in -- things could have been much, much worse.

13            MR. LAWLOR:  Right.

14            THE COURT:  And perhaps it's possible to put his

15    behavior down to, you know, exuberance.  But firing a loaded

16    weapon in the middle of a riot is dangerous.

17            MR. LAWLOR:  No, I understand.  I understand that.

18    But I did want to let the court know that Mr. Banuelos's

19    intentions that day were not meant to be violent.  I hate to

20    use the word "festive" because that sounds silly, but I think

21    the court knows, in some corners — New Year's Eve, for example

22    — in this city at midnight, ShotSpotter goes wild because

23    people fire guns all around the city.

24            THE COURT:  And people get hurt.

25            MR. LAWLOR:  I understand.

1          THE COURT:  I've defended people who fired those shots.

2          MR. LAWLOR:  I understand.  But all's I mean to say by

3     that is Mr. Banuelos's intentions were not violent.

4          THE COURT:  He was carried away by the spirit of the

5     moment.

6          MR. LAWLOR:  At that time.  And I think the court

7     will learn later that he no longer believes in the things

8     that caused him to be so emotive that day.

9          THE COURT:  All right.  Well, that's good to hear.

10    Thank you, Mr. Lawlor.

11       All right.  At this stage -- did you want to respond?

12          MS. LEDERER:  I apologize, Your Honor.  If you would

13    like any clarifications, I just want to --

14          THE COURT:  Sure.

15          MS. LEDERER:  -- let Your Honor know, and I think

16    it's outlined in the detention memo, but just so the record's

17    clear, Mr. Banuelos was, at the initial start of the

18    investigation, right before he was arrested -- and when I'm

19    saying "the investigation," I mean the investigation portion

20    right before he was arrested, it was believed that

21    Mr. Banuelos was permanently residing in the Summit, Illinois,

22    address.

23          THE COURT:  What's the Utah issue?  Was there an

24    allegation he was in Utah at some point?

25          MS. LEDERER:  Yes, Your Honor.  Your Honor, his

1    children had been living in Utah.  So he had been in and out

2    of Utah for a while.  That's where the stabbing had occurred,

3    was in Utah.  That's where the two bench warrants are from,

4    out of Utah.  That's where several of his adult convictions

5    are from, in Utah.  And when he was investigated for the

6    stabbing in Utah, he was picked up on a 2019 bench warrant.

7        But just to go back to the residence, the government does

8    have concerns that there is no stable residence in Illinois,

9    and that's because he was -- after the search warrant was

10    executed at the family home, it was learned that Mr. Banuelos

11    was only allowed to stay in the basement on nights that he had

12    work.  A secondary address was learned that he also had a

13    house about a half hour away that he would stay when he didn't

14    have work.  The government then executed a search warrant at

15    that location as well.

16        When Mr. Banuelos was arrested, he provided to Pretrial

17    Services in Illinois the wrong address at that second

18    location.  And in part of the investigation, it was also

19    determined that he was living in the basement of the home --

20    of the family's home over the objection of some family

21    members.  So even though he was there consistently when he

22    had work, it still was not a stable living environment.

23        THE COURT:  All right.  Thank you, Ms. Lederer.

24        All right.  Based on the record before me, I'm going to

25    deny the motion for release for the reasons outlined in the

1    government's opposition.

2        First, with respect to the nature and circumstances of the

3    offense, as I've already said, even if Mr. Banuelos disputes

4    the government's allegations that he made threatening gestures

5    to law enforcement -- and I frankly am not even weighing that

6    in there, okay?  That's to be determined by a jury, possibly.

7        But the fact that he had a loaded weapon, fired it in the

8    air, in circumstances even where he may not have meant to hurt

9    anyone is inherently dangerous circumstances that could have

10   been much more tragic.  He's alleged to have helped the crowd

11   push against police lines, climb scaffolding, fire two shots

12   in the air, changed clothing, and was at the Capitol for quite

13   a period of time.  Any of those actions could have resulted in

14   an injury.

15       Second, the weight of the evidence is strong.  The

16   government included 16 photographs and video exhibits with

17   its opposition — for example, Exhibit 11 — that depict a

18   figure that appears to be Mr. Banuelos firing two shots into

19   the air on the scaffolding.

20       Third, regarding his history and characteristics,

21   Mr. Banuelos has five adult convictions including two

22   convictions for assault and two for resisting arrest or

23   fleeing from law enforcement.  It is true that those are not

24   felonies, but that's a lot.  He's also failed to appear for

25   domestic-violence proceedings in Utah, and as the government

1    noted, he has two open bench warrants.  That is a pretty

2    strong indication for this court that he is a flight risk,

3    especially given that he faces serious prison time in this

4    case if he's convicted.

5        Finally, with respect to the nature and circumstances

6    of the danger that Mr. Banuelos poses to any person or the

7    community, his affinity for firearms and violent behavior is

8    concerning to the court.

9        According to the government, Utah prohibited Mr. Banuelos

10    from possessing a firearm in a protective order back in 2021,

11    yet he continues to possess and access firearms as recently as

12    March 2024.  His apparent choice to discharge a firearm more

13    than once in the midst of massive crowds and a riot at the

14    Capitol also indicates that he may also pose a danger to the

15    community if released.

16        And I take Mr. Lawlor's argument that this perhaps was

17    an act of, as I said previously, exuberance or, you know,

18    solidarity or something, but it could have been -- it was

19    inherently dangerous and could have resulted in injury or loss

20    of life.

21        So, for those reasons, I do find by clear and convincing

22    evidence that his detention is justified on the grounds of

23    dangerousness and there's a preponderance of the evidence that

24    he would pose a flight risk.  Therefore, I will continue at

25    this point his pretrial detention.

1      Now, Mr. Banuelos, as time goes by, sometimes things change.

2  There are changes that happen or changes that happen in the

3  government's case, and sometimes, for example, a case gets old

4  and the government is taking a long time to go to trial, or

5  something that may cause me to reconsider my decision.  But at

6  this stage in the proceedings, I'm not inclined to change

7  Judge Jantz's decision.  I think it was supported by the law

8  and the facts.

9      So assuming that the government's going to provide the

10  remaining discovery and plea offer to Mr. Banuelos, what's

11  your request, Ms. Lederer?

12      MS. LEDERER:  Your Honor, my request was going to be

13  twofold.  I didn't know how everyone's calendars look.  I know

14  all of us tend to get booked up very quickly, so I was going

15  to suggest maybe we do actually pick a trial date today, just

16  to get on the books, but then also to pick maybe a 60 or 90

17  status date to bring it back to see if there will be a plea.

18      THE COURT:  That makes sense.

19     Mr. Lawlor, are you in agreement with that?  You all

20  probably have more trials scheduled than I do at the moment.

21      MR. LAWLOR:  Your Honor, my recommendation would be

22  that we just pick a status date at this time.

23      THE COURT:  Well, here -- I mean, I'm fine with doing

24  that.  The problem is, Mr. Lawlor, if we do that and it's,

25  say, 45 days or 30 days in the future and your client's held

1    without bond and we come back and there's not going to be a

2    disposition, then we have to pick a trial date, and then your

3    calendar or Ms. Lederer's calendar, or even mine, possibly,

4    may be busier.  So I don't mind, but that's one of the risks

5    we take.  We can set it down for a shorter status of 30 days,

6    if you like.

7            MR. LAWLOR:  Court's indulgence.

8          (Defense conferring.)

9            THE COURT:  And just for purposes of discussion, what

10   date for trial were you -- have you all discussed this?

11           MS. LEDERER:  No.

12           THE COURT:  I know Mr. Lawlor's booked up a lot.

13   I'll get it from him in a minute.

14      Mr. Lawlor, if we were to sort of look at the trial

15   schedule, when are you free?

16           MR. LAWLOR:  I mean, I can tell the court it's

17   certainly not until early 2025 at this point.

18           THE COURT:  See, that's why I'm concerned that we lock

19   a date in, so that you don't get more scheduled.

20           MR. LAWLOR:  I'll defer to the court.  I tend to think

21   it's not necessary at this point in time, but if everybody

22   else is inclined to set it now...

23           THE COURT:  I know I have some trials in January.

24   Hold on.  Let me take a look.  And I have some unavailability

25   in February.  As a detained defendant, Mr. Banuelos gets

1    priority over nondetained defendants and over civil matters.

2    Let's see.  I've got one on the 13th.  That defendant is not

3    detained.  I could do this -- we don't want to do this on

4    January 6.  That would be -- all right.  We could do it on

5    the 7th.  I'm free that week, that first full week.

6          MR. LAWLOR:  Your Honor, I start a very, very serious

7    trial the 13th, so I would not want to be in trial the week

8    before.

9          THE COURT:  Okay.  Then that convinces me more that I

10   think we just need to set a placeholder date.  When is that

11   one scheduled to be over?

12         MR. LAWLOR:  It's just that week, 13th through 17th.

13         THE COURT:  All right.  The 20th is a holiday and also

14   inauguration day.  We could start Tuesday the 21st.

15         MR. LAWLOR:  Your Honor, the only problem with that

16   is I'm in trial the week before, so I wouldn't really be able

17   to --

18         THE COURT:  Okay.  Monday, the 3rd of February?

19         MR. LAWLOR:  I'm available.

20         MS. LEDERER:  Your Honor, I'm available.  The

21   government is available.  I do have a pretrial conference that

22   Friday in case it runs long, but my co-counsel in that case

23   will cover it.

24         THE COURT:  Okay.  And we can work around that.  So

25   Monday, February 3.  Okay.  We're just going to block it off.

1    Trial Monday, February 3, at 9:30.  And normally I'd ask you

2    all to meet and confer and submit a proposed pretrial

3    scheduling order, a proposed joint pretrial scheduling order,

4    but rather than have you go through that exercise now, let's

5    set an interim status date, and we can talk about that.

6        So how much time do you think it will be before you get a

7    plea offer to Mr. Banuelos?

8        MS. LEDERER:  Hopefully, I can turn that around.  I am

9    going on vacation next week, and then I start a trial the week

10   after, so I'm going to be a little tied up, but I'd say 30 to

11   45 days.

12       THE COURT:  Let's look at 30 days, because then I'm

13   going to need to order you all to give me a pretrial schedule

14   if it doesn't happen.  So is the 20th okay with you, Mr. Lawlor?

15       MR. LAWLOR:  If it's a 9:00 or 1:00, yes, Your Honor.

16       THE COURT:  I can do it at 1:00.

17       MS. LEDERER:  Yes.

18       THE COURT:  Okay.  September 20th at 1 p.m.

19       Now, Mr. Lawlor and Ms. Lederer, if this is going to be a

20   disposition, then you need to let chambers know so I can block

21   off a full hour, and I need to have the paperwork a couple

22   days ahead of time so I can prepare my hearing materials.  So

23   just let chambers know if I should convert that status hearing

24   to a disposition hearing.

25       Is there a request for exclusion of time?

1          MS. LEDERER:  Yes, Your Honor.

2          THE COURT:  Any objection?

3          MR. LAWLOR:  No, Your Honor.

4          THE COURT:  All right.  Mr. Banuelos, I think we've

5     talked about this before.  There's a Speedy Trial Act that

6     says you have to be brought to trial within 75 days.  In most

7     cases, 99 percent of the cases, there's at some point I stop

8     that clock so it gives everybody a chance to get ready.

9     There's no point in rushing to trial if you're not ready.

10    So the government has requested that the clock be stopped

11    till our next hearing.

12         Your lawyer doesn't object, given that he has a lot of

13    discovery to go through, and obviously he's going to have to

14    talk to you about how you want to proceed next.  So I do find

15    that the interests of justice outweigh the public and the

16    defendant's right to a speedy jury trial, and therefore I will

17    exclude from computation under the Speedy Trial Act the time

18    from today's hearing till our next scheduled status hearing on

19    September 20 at 1 p.m.  Anything further?

20         MS. LEDERER:  No, Your Honor.

21         THE COURT:  Mr. Lawlor?

22         MR. LAWLOR:  No, Your Honor.  Thank you.

23         THE COURT:  All right.  See you all on September 20.

24    Thank you.

25         (Proceedings adjourned at 12:07 p.m.)

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne